## Louisville & Nashville Railroad Company v. Hyatt's Administrator.

(Decided May 5, 1922.)

### Appeal from Laurel Circuit Court.

Railroads—Action for Death of Trackwalker—Evidence.—Upon a former appeal of this case it was held that plaintiff's right to recover for the death of his decedent, a trackwalker, depended upon proof of a rule requiring signals for his benefit from the train that struck and killed him; and as the evidence on the second trial failed to prove the existence of such a rule and was

otherwise the same as on the first trial, the court erred in refusing to direct the verdict for the defendant company.

B. D. WARFIELD, GEO. W. BROCK and H. J. JOHNSON for appellant.

C. R. LUKER, RAY LEWIS and L. P. THOMPSON for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

Davis Hyatt was struck and killed on August 5th, 1917, by a train of the defendant, at or near an abrupt curve on "Crooked Hill" between Livingston and East Bernstadt. He was at the time, and had been for some time prior thereto, a member of a section crew whose duty it was to walk and inspect the track between the two points named.

This is an action by his administrator to recover for his death, alleged to have been caused by the negligence of the defendant's agents in the operation of the train that struck him.

Upon a former appeal, reported in 191 Ky. 85, 229 S. W. 101, a judgment in favor of the plaintiff was reversed because of the failure of the trial court to direct a verdict for the defendant. After reviewing the testimony and the authorities, we said:

"Section men assume the risk of injury from approaching trains, and must keep a lookout for their own safety. Generally speaking, those in charge of trains are under no duty to give such employes warning of approach of trains. However in unusual and exceptional cases where it is, or ought to be, apparent to trainmen that a section hand is in danger and might be unconscious of that fact, it is their duty to warn him. Unless, therefore, this record presents such circumstances, a motion for a directed verdict should have prevailed. . . .

"It was decedent's duty to look out for approaching trains, nor was appellant required to moderate the speed of its train or maintain a lookout or to give signals of its approach, unless there was a rule of the company requiring the giving of signals as above stated. . . .

"There was an effort to prove the existence of a rule requiring trains to signal their approach to curves. The exact nature, extent and purpose of said rule do not appear—the rule is not in evidence—therefore, we are unable to say whether it was such as decedent had a right to rely upon or such as created a situation so extraordi-

nary and unusual as to make the case an exception to the general rule applicable to track walkers. If, however, upon a retrial it is shown by competent evidence, that at the time Hyatt was killed the company had a rule requiring trainmen to give signals before rounding curves, such as existed at Crooked Hill, signals upon which persons sustaining the same relation to appellant as did decedent, had the right to rely, and there is a conflict in the evidence whether such signals were given, then the case on this question would be for the jury.''

The above is not only a correct statement of the law of this state, as the authorities cited in that opinion will show, but it is certainly the law of this case.

The evidence upon the second trial was the same in substance, in all particulars, as upon the former trial, except with reference to the existence of a rule requiring trains to signal their approach to curves, and the decedent's right to rely upon same.

We need now, therefore, consider only the evidence in these two particulars, and if the plaintiff upon the last trial failed to establish either of these two essential facts, the trial court, in obedience to the former decision of this court, should have directed the verdict for the defendant, as requested.

To prove the existence of such a rule as above referred to, plaintiff introduced rule 14, subsection 11, of the company's rules with reference to signals, which reads:

''Two longs and two shorts approaching crossings, grade and tunnels, and will be used by extra trains when approaching abrupt curves.''

It is at once apparent that in order to show the applicability of this rule it was incumbent upon the plaintiff to prove that the train that killed decedent was an extra train. An extra train, as defined in the same book of rules, is: ''A train not authorized by a time table schedule.''

The proof as to whether or not this train was so authorized, is as follows:

By Flagman E. Hansel:

''Q. Did that light, or loose engine have an authorized time table schedule? A. Well, I can't say we did, whether we was running extra or scheduled, I don't remember was running orders, whether we was running extra or whether we was scheduled, I can't say. Sometimes we left the starting point we run as on schedule; of course

we would have a time table route, when you run extra we have no time table routes.

"Q. And you left East Bernstadt back to Livingston? A. As well as I remember we got orders soon after we arrived at East Bernstadt, and returned.

"Q. Then, Mr. Hansel, that train wasn't authorized by any time table schedule? A. I told you I didn't remember that.

"Q. Well, if you arriving at East Bernstadt, and immediately run around the 'Y' and turned around and started back to Livingston, went back to Livingston, were you authorized by time table schedule? I don't remember the running orders that day—I can't say whether we was an extra or whether we was on a schedule, I wouldn't say, could have been possible we went on schedule. . . .

"Q. Have you examined the time table schedule before that—you were acquainted with it? A. Yes, sir. . . .

"Q. Were you running on the time of any regular scheduled engine? (Defendant objected, overruled, exception.)

"Q. What was your usual method of turning around and going back? A. Usually run back as an extra.

"Q. Mr. Hansel, does the company require an engine such as you were running on that day, or is there a rule requiring the company to have a conductor on same? (Defendant objected, overruled, exception.)

"Q. By the court: Was there a conductor on it? A. No, sir.

"Q. Does the rule require a conductor on such a train? A. All designated trains is supposed to have an engineer and conductor.

"Q. Was this train you were on a designated train? A. It was, it had a starting point—yes, sir.

"Q. Mr. Hansel, what do you mean by 'having a starting point?' A. Had to have, or we couldn't have been out there on the main track.

"Q. Is it possible for a train not to be a designated train? A. It could be possible, but he would be taking his life into his own hands if he did, out on the track.

"Q. I wish you would turn to—I am not acquainted with this book of rules—and read to the jury where it requires designated trains to have an engineer and a conductor? A. Here is one. (Defendant objected, overruled, exception.) A. 'Watches of conductors and enginemen

must be compared before starting on each trip, with a clock designated as a standard clock, and with each other. The time when watches are compared must be personally registered on a prescribed form.' That is all.

"Q. Now, if you didn't have a conductor on that train, you couldn't have observed this rule, could you? (Defendant objected, sustained, exception.)

"Q. Was this rule observed on that day? Well, I don't hardly think it was, according to your question. We didn't have any conductor."

By Fireman F. H. Jenkins:

That this train run as an extra more often than on schedule, but he did not remember which way it was running when it killed decedent.

By Engineer Buck Welch:

"Q. Is there any instructions to you to ring the bell or sound the whistle in passing through a tunnel or round sharp curves? A. Nothing about tunnels.

"Q. Is there any in going around abrupt curves, any rule? A. Light and extra engines are supposed to blow the whistle around abrupt curves and road crossings.

"Q. You was running a light engine, or an extra, wasn't you? A. I don't know whether it was as an extra, or running as a schedule train.

"Q. Let it be whichever it may, the same rule applies to a light engine, whether it is running on schedule or as an extra. Suppose an extra engine is running light on the schedule, it isn't necessary under the rules for you to blow the whistle in going around curves, is that right? (Defendant objected, overruled, exception.) A. Under the rules, it wouldn't be.

"Q. If you were running extra, it would be? (Defendant objected, overruled, exception.) A. According to the rules, yes.

"Q. Do you know which you were doing that day? A. I wouldn't be positive."

This evidence, which is all there is in the record on the subject, has no tendency whatever to prove whether the train that killed decedent was or was not on that day a special train. It proves it was one or the other, but not which. Except for the introduction of the rule and the definition of "extra train," it does not differ at all from the evidence we held insufficient on the former appeal.

It is, therefore, clear that the plaintiff failed to prove the existence of the duty of the defendant to warn him of the approach of the train, and as his only claim of negli-

gence is an alleged breach of such duty, the defendant's motion for a peremptory instruction should have prevailed.

This conclusion renders consideration of other alleged errors unnecessary, since for this reason alone the judgment must be and is reversed.